## UNITED STATES HOFFMAN MACHINERY CORPORATION v. CUMMINGS-LANDAU MACHINERY CO., Inc.

### No. 369.

Circuit Court of Appeals, Second Circuit.

July 15, 1940.

Morrison, Kennedy & Campbell, of Washington, D. C. (Clarence B. Des Jardins, of Washington, D. C., and Arnold S. Worfolk, of New York City, of counsel), for defendant-appellant.

Daniel L. Morris and Blair, Curtis, Dunne & Hayward, all of New York City (Edward G. Curtis and Charles C. Ladd, both of New York City, of counsel), for plaintiff-appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment for the plaintiff in an action to enjoin the infringement of Patent No. 1,723,940, issued August 6, 1929, for a centrifugal machine, used principally to dry clothes. The patent had only one claim, and the only issue we need discuss is its validity. Such machines consist of a casing, or "curb", a basket, rotating within the "curb" upon a shaft, and a motor to spin the shaft. The machine hangs by three "links" from brackets, set in the floor of the building. The basket is an open circular tub with perforated vertical sides, into which the wet clothes are thrown; its bottom is raised in the centre, and into the recess so made the shaft projects from below, its upper end being rigidly fixed to the basket. Its lower end is equipped with a pulley, the belt around which is driven by a motor, which the "curb" may, or may not, carry. The "curb" surrounds the basket to receive and drain off the water, and carries the two bearings of the shaft. It takes a very high speed of rotation to drive out the water—at times as high as 750 R. P. M.—and, however carefully the center of the basket may be designated to be at the centre of the shaft, when the wet clothes are thrown in, the centre of gravity of the load—clothes and basket—will describe a circle of revolution; the effect being the same as though there were a weight attached to, and revolving about, the shaft. This sets up serious strains, which, unless they are taken up, will destroy the machine, and even affect the building in which it is housed.

The first element of the invention at bar was that the upper bearing of the shaft should be substantially in the horizontal plane of the centre of gravity of the operating load, thus avoiding any vertical leverage upon the shaft. However, as the plane of the centre of the load shifts vertically not only with the amount of clothes that are thrown in, but with the water in them, the disclosure and claim merely required that the upper bearing should be "approximately" in the plane of the centre of gravity. The second element was the position of the "links". As we have said, the whole machine—basket, "curb" and motor—hangs by three "links"; straight shafts, terminating at each end in a ball; the lower ball seated in a lug at the bottom of the "curb", the upper in the end of a bracket which is rigidly fixed to the building. Thus, as the basket rotates and the centre of gravity of the load swings around the shaft, the "curb" is free to swing on the "links", taking up the strain by an eccentric revolution of its own. The invention in suit required that the upper ends of the "links", like the upper bearing of the shaft, should be in the centre of gravity of the load. Finally, the third element of the invention was that the "curb" should carry the motor. The single claim enumerates all these elements; it is not important to set it out in extenso.

The argument for invention, which succeeded below, is that nothing which had appeared theretofore, had embodied all the three features just mentioned. There cannot, however, be any doubt that Bryson (No. 1,311,871) had anticipated the first

feature in the following passages of his disclosure (p. 2, 11. 50-52): "The radial bearing is thus in the same horizontal plane with the centre of gravity of the basket and load". Again (p. 2, 11. 78-83): "By having one radial bearing at approximately the centre of gravity of the basket and its load, and the other radial bearing in line with the belt pull, the eccentricity of bearing load is reduced to a minimum". Several of his claims introduced the same feature. The patent must therefore depend upon the other two elements, and we may at once eliminate the third, i. e., carrying the motor on the "curb", for that goes back to 1886 (Alliott, 1886 Brit. No. 3190) and to Broadbent's Catalogue of 1892. It is true that in both cases the machine was steam driven, but that can make no difference. Besides, Krantz himself disclosed a motor carried by the "curb" in his Belgian patent (1923, No. 308,266), issued more than two years before his filing date.

If there was an invention, it lay in the second element—the position of the "links". It had been standard practice since 1881 (Müller, No. 240,840) to swing the "curb" upon three "links" with ball and socket joints. Schaum, 1896 (No. 552,550); Psarsky, 1913 (No. 1,071,956); Bryson, 1919 (No. 1,311,871); Eynon, 1925 (No. 1,564,-770); and in some instances the upper ends of the "links" were approximately in the plane of gravity of the load: e. g. Jahr (1901 Germ. No. 123,244). But nobody had ever prescribed such a relation, and we could hardly hold that the art had actually anticipated it. Krantz declared that it produced "a more efficient dampening effect" (p. 2, 11. 102, 103); but upon this record it is extremely doubtful that it does anything of the sort. Ray, the defendant's expert, said that the only important factor in "dampening" was the length of the "links", and while it would perhaps be unfair to say that Locke, the plaintiff's expert, actually committed himself, he seemed to agree; at least he admitted on cross-examination that it was the optimum length of the "links" that was the controlling factor. There is, however, an advantage in having the tops of the links as low as possible; they are then out of the way of the basket, and the rigid brackets can be shorter. And on the other hand, there is an advantage in not having them too low, for that would require lowering the lugs below the bottom of the "curb". Neither of these was Krantz's purpose and, indeed, when he filed his application he had no idea of including this feature in his patents at all. None of his seven claims contained it; and it was only after the examiner had rejected them all on Bryson that his solicitor introduced it and that too without any oath. It appears to be rather his invention than Krantz's. We are therefore disposed to believe that there is no substance in this detail at all, but even if there is, the patent cannot rest upon it. If Krantz really did add to the "dampening effect", nobody has been able to verify it; all that we know is that, when the "links" are of proper length, they give good results if put in the prescribed position. But so they do in any position. The discovery, if there was indeed a discovery, was empirical in any event, and its importance does not justify imposing upon competitors the handicap of designing their machines so as to be deliberately inconvenient. A patent is given in consideration of some benefit to the art, and any benefit is here too contingent to serve.

There remains the question whether it was an invention to combine all three of these elements in one machine. The defendant answers that such a combination is only an "aggregation"; but we shall not essay an answer to that question, in any case soluble only by Schoolmen. It is enough here that the combination of three factors—two of them familiar to the art, and the third of no proved value—was a matter of convenience not beyond the powers of the ordinary designer. The patent has had some success, but it comes to no more than putting the motor into Bryson's "curb" and the "links" in their obviously most convenient position. Such permutations ought to remain open to the art at large; it requires no exceptional talent to call them forth.

Judgment reversed; complaint dismissed.